**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA**

CHRISTOPHER J. BARNETT,      )
                                )

      **Petitioner,**         )
                                )

v.                        )      **Case No. 23-CV-0556-CVE-MTS**
                                )

TOMMY SHARP, Warden,[1]      )
                                )

      **Respondent.**      )

**OPINION AND ORDER**

Petitioner Christopher J. Barnett, an Oklahoma prisoner appearing pro se, seeks federal habeas relief under 28 U.S.C. § 2254, asserting that he is in state custody in violation of federal law pursuant to the criminal judgment entered against him, in Tulsa County District Court Case No. CF-2019-3570. Dkt. ## 7, 16, 28, 29. Barnett raises the following four grounds for habeas relief: 1) "Brady and Giglio Violations; 2) "Napue Violations;" 3) "Fourth Amendment Violations;" and 4) "More Napue Violations[.]" Dkt. # 7, at 5-10.[2] Respondent Tommy Sharp, by and through Gentner F. Drummond, the Attorney General of the State of Oklahoma ("the state"), responds that Barnett's claims are procedurally barred. Dkt. # 30. The Court considered Barnett's amended petition for writ of habeas corpus (Dkt. ## 7, 16, 28, 29), respondent's response to petition for writ of habeas corpus (Dkt. # 30), the state court records provided by respondent (Dkt. ## 31,

---

[1]    Barnett is currently incarcerated at the Joseph Harp Correctional Center, and Tommy Sharp is the current warden of that facility. The Court therefore substitutes Tommy Sharp, Warden, in place of Casey Hamilton as party respondent. See Rule 2(a), Rules Governing Section 2254 Cases in the United States District Courts. The Clerk of Court shall note on the record this substitution. Furthermore, Barnett's motion to update respondent to warden Tommy Sharp (Dkt. # 75) is granted.

[2]    The Court's citations refer to the CM/ECF header pagination.

32, 44), Barnett's reply (Dkt. ## 45, 46), and applicable law. For the following reasons, the Court denies Barnett's petition.

## I.    Factual background

In Tulsa County District Court case number CF-2019-3570, Barnett was convicted of assault and battery with a deadly weapon. The conviction arises from Barnett shooting a process server, Ian Napier. On July 24, 2019, around 9:00 p.m., Napier arrived at 7520 East 102nd Street in Tulsa, Oklahoma, to serve Barnett with legal papers. Dkt. # 31-8, at 184-185, 187, 189. The sun was setting but "[i]t wasn't pitch black out," and Napier could see where he was going. Id. at 189. Using an app on his cell phone, Napier recorded the audio of his attempt to serve Barnett. Id. at 189-191, 203-204; Dkt. # 32 (State's Ex. 3). Furthermore, Barnett's home surveillance cameras recorded the exchange between Napier and Barnett. Dkt. # 32 (State's Exs. 1 and 2).

Napier rang the doorbell and Barnett, from inside the home, responded, "can I help you?" Dkt. # 31-8 at 223; Dkt. # 32 (State's Exs. 1, 2 and 3). Napier answered, "Hi, I'm looking for Christopher." Dkt. # 32 (State's Exs. 1, 2 and 3). Barnett responded, "you have the wrong house. Get off my property or you're going to be dead." Id. The following exchange occurred:

**Napier**: Say again.

**Barnett**: Get off my property or you're going to be dead.

**Napier**: Okay, I'm just here trying to deliver documents to Christopher, that's all I'm trying to do. [Displays paperwork to Barnett in his left hand.]

**Barnett**: [inaudible] off the property now!

**Napier**: Okay, I'm leaving but no unnecessary threats or acts of violence, it's all been recorded, okay. [Transfers paperwork to his right hand.]

**Barnett**: Get off the property or you're going to be dead.

**Napier**: I can't hear you unless you open the door. I can't hear you.

[Napier takes a few steps away from the front door.]

**Napier**:  I can't hear you.

[Napier continues walking across the yard.  He turns back towards the front door approximately 37.5 feet from the house and gestures over his shoulder with his left hand, the paperwork is still in his right hand.]

**Napier**:  I'll wait for you out here, okay?

[Barnett fires a gun.]

Dkt. # 32 (State's Exs. 1, 2 and 3); Dkt. # 31-9, at 53.

Napier had a firearm holstered inside his waistband on his backside during the event.  Dkt. # 31-8, at 184-187.  His shirt covered the firearm.  Id.  Napier never brandished his weapon.  Id. at 204; Dkt. # 32 (State's Exs. 1 and 2).

Barnett testified, in his own defense, that a person he did not know arrived at his home around 8:55 p.m. on July 24, 2019.  Dkt. # 31-9, at 106.  Barnett testified that "[t]hey had asked for a Chris Barnett.  I did not want to deal with anyone.  I was going to bed.  I told him he was at the wrong house and he was trespassing on private property."  Id. at 107.  Barnett's counsel asked, "[h]ow did he respond to what you said to him?"  Id.  Barnett answered that "[h]e claimed he couldn't hear me."  Id.  Barnett "told him again to leave, he was trespassing on private property.  I told him that again and I know I said something to the effect of, leave now or you will be dead.  I will shoot you or something to that effect just so that he would leave."  Id.  At this point in the exchange, Barnett had a gun in his hand.  Id.  Barnett watched Napier through his textured glass door which warped his perception.  See id. at 108.  According to Barnett, when Napier stopped in the front yard and turned around "it look[ed] like [Napier] [was] pulling a gun from his right-hand

side." Id. at 109.[3]  Barnett was "scared to death" and "terrified." Id.  In response to Barnett's alleged observation of Napier pulling a firearm, Barnett shot Napier. Id.  The jury was instructed as to self-defense. Dkt. # 31-13, at 193-195.

The jury found Barnett guilty of assault and battery with a deadly weapon. Dkt. # 31-13, at 201.  In accordance with the jury's recommendation, Barnett was sentenced to a term of thirty-two years' imprisonment. Dkt. # 31-14, at 5.[4]  To the extent necessary, additional facts will be discussed below.

## POST-CONVICTION STATE COURT PROCEEDINGS

After his conviction, Barnett filed a direct appeal, and the Oklahoma Court of Criminal Appeals ("OCCA") upheld his conviction and sentence. Dkt. # 30-1, at 120-126.  As noted by the state district court, after the OCCA's adjudication of Barnett's direct appeal, Barnett "filed dozens of pleadings with the [state district court]. [The pleadings] overlap and repeat arguments from one to the next, with many scattered assertions of why Barnett deserves a new trial or an outright release. . . . Barnett's arguments are often unclear, confusing, and prolix[.]" Dkt. # 30-2, at 171. The state district court adjudicated an application for post-conviction relief (id. at 132-205), an "amended application for post-conviction relief" (Dkt. # 30-4, at 54-101) and "third and

---

[3]   Barnett testified that, while Napier walked away, he "opened the door briefly for just a second to look out[.]" Dkt. # 31-9, at 109.  In a news interview, Barnett recounted that, as Napier walked off, Barnett opened his front door a little bit. Dkt. # 32 (State's Ex. 19).  It is possible Napier turned around in response to hearing Barnett's door open.

[4]   On July 25, 2019, Barnett was also charged with four counts of threatening an act of violence in Tulsa County District Court case number CF-2019-3495 ("3495").  Docket, Oklahoma v. Barnett, CF-2019-3495 (Tulsa Cnty. Dist. Ct.).  This case involved threats against the University of Tulsa, professors, and fans leaving a school football game. Dkt. # 30 at 33, n. 25.  The 3495 charges are irrelevant to Barnett's conviction for assault and battery with a deadly weapon.  Nevertheless, Barnett often refers to the 3495 matter throughout his filings in the instant case.

subsequent applications for post-conviction relief" (id. at 279-284). When adjudicating Barnett's various post-conviction relief filings, the state district court endeavored to address each claim raised by Barnett. See, e.g., Dkt. # 30-2, at 153-171. The state district court denied each application. Dkt. # 30-2, at 132-205 (first application); Dkt. # 30-4, at 54-101 (amended application); id. at 279-284 (third application). Barnett appealed the district court's rulings. Dkt. # 30-2, at 206-210, 217-232 (appeal of denial of first application); Dkt. # 30-4, at 102-105 (appeal of denial of amended application); id. at 305-310 (appeal of denial of third application). The OCCA affirmed the district court's decision each time. Dkt. # 30-2, at 473-479 (OCCA adjudication of first application); Dkt. # 30-4, at 187-190 (OCCA adjudication of amended application); id. at 320-322 (OCCA adjudication of third application).

## BARNETT'S HABEAS ACTION

Next, Barnett initiated the instant habeas proceeding. See Dkt. ## 7, 16, 28 and 29. Barnett presents the following claims:

**Ground One:** Brady[5] and Giglio[6] violations, withholding and suppressing material exculpatory evidence.

The State withheld and suppressed a mental health treatment note from the alleged victim. The State withheld reports from The University of Tulsa in which TU accused someone else of posting on my FB page, but the state had TU ready to testify that I had made all of these post[s]. The State also withheld copies of both of my phones, which are exculpatory and prove self defense. The affidavit of Attorney Brendan McHugh is in the file, I filed it with the court clerk in this case. The State also withheld police reports from the US Marshalls [sic.] Service showing

---

5   "A Brady violation occurs when the government fails to disclose evidence materially favorable to the accused." Youngblood v. Virginia, 547 U.S. 867, 869 (2006); Brady v. Maryland, 373 U.S. 83 (1962).

6   In Giglio v. United States, 405 U.S. 150 (1972), the Supreme Court of the United States held "that where the reliability of a witness may be determinative of guilt or innocence of a criminal defendant, nondisclosure of material evidence affecting the reliability of the witness justifies a new trial." Singer v. Steidley, Case No. 13-CV-72-GKF-TLW, 2014 WL 580139, at *1, n. 1 (N.D. Okla. Feb. 12, 2014) (unpublished).

I did not threaten TU.  This was exculpatory since it was the state[']s witness in this case.  I was denied a fair trial.

**Ground Two:**  Napue[7] Violations.

The State told the Jury that I was planning to shoot and kill a process server and I had been planning for this my whole entire life.  The State presented Facebook Post[s], which The University of Tulsa obtained due to litigation my ex-husband and I had against them.  The State was in possession of a compl[ai]nt from TU Professor Susan Barrett where she had sent an email, claiming I was making post on FB again, then she filed a compl[ai]nt against my ex-husband with TU Vice Provost Winona Tanaka saying that my ex-husband was making the fb post, hiding behind me.  TU provided this to the prosecution, but the state withheld it.  The TCDA knew someone else made the post, but told the jury I had made the comments.  The TCDA withheld and suppressed the reports until 11/2022.  I raised this claim in Jan 2024 as soon as I found out.

**Ground Three:**  Fourth Amendment Violations, Thumb Drive and Cell Phones searched with no warrant.

The state reveals on 12/20/2023 that they searched and copie[d] my phones, 4.5 years ago.  The State also viewed the thumb drive that was on me when I was arrested with no warrant.  The thumb drive was used at trial to convict me.  My counsel did not move to suppress.  In CF20193495, Judge David Guten found that both the cell phones and thumb drives were searched with no warrants and suppressed the information from CF20193495.  The State sent the cell phones to Sapulpa to be searched to conceal the search.  This also violated [B]rady since the state did not turn over a copy of the copies of the phones made.

**Ground Four:**  More Napue Violations.

The State[']s witness who was shot in self defense and for trespassing told the police several stories.  Napier claimed he could not hear me tell him to leave he was trespassing, but he walked 37.5 feet out into the yard and turned quickly, making a grabbing motion for what was believed to be his gun, which petitioner had already spotted on him.  Napier was shot in the elbow in self defense.  Napier was seen on body cam claiming "I was leaving, I was leaving," if he was leaving, why did he tell police he ran for his car to get his gun, and why did he turn around 37.5 feet out into my yard to tell petitioner he'd be by his car.  If he couldn't hear petitioner at his door, how is the petitioner going to hear him 37.5 feet away.  The TCDA knew Napier lied & is supported by evidence.

---

[7]    "A Napue violation occurs when (1) a government witness committed perjury, (2) the prosecution knew the testimony to be false, and (3) the testimony was material." United States v. Garcia, 793 F.3d 1194, 1207 (10th Cir. 2015); Napue v. Illinois, 360 U.S. 264 (1959).

Dkt. # 7, at 5-10.  Respondent urges the Court to deny the petition, asserting that habeas review of these claims is barred because Barnett procedurally defaulted each claim in state court.  Dkt. # 30 at 33-42.

## DISCUSSION

Under the doctrine of procedural default, federal courts are precluded from "consider[ing] issues on habeas review that have been defaulted in state court on an independent and adequate state procedural ground, unless the petitioner can demonstrate cause and prejudice or a fundamental miscarriage of justice."  McCracken v. Gibson, 268 F.3d 970, 976 (10th Cir. 2001) (internal quotations omitted).  "To be independent, the procedural ground must be based solely on state law."  Cole v. Trammell, 755 F.3d 1142, 1159 (10th Cir. 2014) (internal quotations omitted).  To be adequate, a state procedural ground "must be strictly or regularly followed and applied evenhandedly to all similar claims."  Id. (internal quotations omitted).  Where, as here, the state has pleaded the affirmative defense of a state procedural bar, "the burden to place that defense in issue shifts to the petitioner," who must, at a minimum, provide "specific allegations . . . as to the inadequacy of the state procedure."  Hooks v. Ward, 184 F.3d 1206, 1217 (10th Cir. 1999).

To ascertain whether Barnett's claims are indeed procedurally defaulted, the Court will outline Barnett's state court claims relevant to the instant petition and the OCCA's disposition of those claims.

### I.    First application for post-conviction relief

Pertinent to his instant petition, Barnett raised the following claims in his petition in error challenging the state district court's denial of his first application for post-conviction relief:

| Claim presented to OCCA | Habeas claim |
|---|---|
| **Brady** Violation: "When Ian Napier went to the hospital, he told the staff that he suffers from obsessive compulsive disorder and has outburst[s] if others cause him to go a different way. The state did not turn this evidence over until November 2022." Dkt. # 30-2, at 218. | **Ground One:** "Brady and Giglio Violations, withholding and suppressing material exculpatory evidence." Dkt. # 7, at 5. "The State withheld and suppressed a mental health treatment note from the alleged victim." Id. |
| **Brady** Violation: "The State violated Brady v. Maryland by withholding and suppressing evidence favorable to the accused. The state turned over never before seen evidence in November 2022." Dkt. # 30-2, at 206. The state "did not make text messages available from me to counsel where counsel was told someone tried to break into my house." Id. at 219. | **Ground One:** "Brady and Giglio Violations, withholding and suppressing material exculpatory evidence." Dkt. # 7, at 5. "The State also withheld copies of both of my phones, which are exculpatory and prove self defense." Id. |
| **Brady** Violation: "The State did not turn over impeachment evidence from the FBI or US Marshalls [sic.] showing I was investigated and cleared of making threats against the University of Tulsa until November 2022. The University of Tulsa was the State[']s lead witness." Dkt. # 30-2, at 207. The state violated Brady when it did not provide "law enforcement reports from the United States Marshalls [sic.] Service[.]" Id. at 218. "The USMS and FBI was told by the University of Tulsa . . . that [Barnett] had never threatened them." Id. | **Ground One:** "Brady and Giglio Violations, withholding and suppressing material exculpatory evidence." Dkt. # 7, at 5. "The State also withheld police reports from the US Marshalls [sic.] Service showing I did not threaten TU." Id. |
| **Napue** Violation: "The TCDA used a altered Facebook where [Barnett] allegedly asked if he could legally shoot a process server, some six months prior. This does not prove intent." Dkt. # 30-2, at 221. | **Ground Two:** "Napue Violations[.]" Dkt. # 7, at 7. "The State told the Jury that I was planning to shoot and kill a process server and I had been planning for this my whole entire life. The State presented Facebook Post, which The University of Tulsa obtained due to litigation my ex-husband and I had against them. The State was in possession of a complaint from TU Professor Susan Barrett |

8

| Claim presented to OCCA | Habeas claim |
|---|---|
| | where she had sent an email, claiming I was making post on FB again, then she filed a complaint against my ex-husband with TU Vice Provost Winona Tanaka saying that my ex-husband was making the fb post, hiding behind me.   TU provided this to the prosecution, but the state withheld it.  The TCDA knew someone else made the post, but told the jury I made the comments.  The TCDA withheld and suppressed the reports until 11/2022." Id. |
| **Fourth Amendment Violation:**  "The State used evidence obtained in violation of <u>Franks v. Delaware</u> from the illegal arrest in CF-2019-3495.  The evidence was obtained in violation of the Fourth Amendment and used with no notice to convict me in the case." Dkt. # 30-2, at 207.   "The State of Oklahoma illegally obtained the cell phones of the petitioner and did not turn over a complete dump of the phones.  In addition to illegally obtaining the cell phones, the State of Oklahoma did not obtain a warrant to search the cell phones." <u>Id.</u> at 224. | **Ground Three:**   "Fourth Amendment Violations, Thumb Drive and Cell Phones searched with no warrant." Dkt. # 7, at 8. "The state revealed on 12/20/2023 that they searched and copie[d] my phones, 4.5 years ago.  The State also viewed the thumb drive that was on me when I was arrested with no warrant.  The thumb drive was used at trial to convict me.   My counsel did not move to suppress.  In CF20193495, Judge David Guten found that both the cell phones and thumb drives were searched with no warrant and suppressed the information from CF20193495. The State sent the cell phones to Sapulpa to be searched to conceal the search." <u>Id.</u> |
| **<u>Napue</u> Violation:**   "<u>Napue</u> violations, the prosecutor allowed Ian Napier alleged victim to lie on the stand and did not correct perjured tainted testimony." Dkt. # 30-2, at 209.  "Ian Napier told the jury he could not hear the appellant when the appellant told him that he was trespassing and to leave now.  Ian Napier heard the appellant tell him to leave now or he was going to be dead.  A home owner has the right to defend himself and the appellant tried in good faith to scare this man away, because he would not tell him who he was and after the appellant told Ian Napier he was trespassing. | **Ground Four:**  "More <u>Napue</u> Violations." Dkt. # 7, at 10.  "The State[']s witness was shot in self defense and for trespassing told the police several stories.  Napier claims he could not hear me tell him to leave he was trespassing, but he walked 37.5 feet out into the yard and turned quickly, making a grabbing motion for what was believed to be his gun, which petitioner had already spotted on him. Napier was shot in the elbow in self defense. Napier was seen on body cam claiming 'I was leaving, I was leaving', if he was leaving, why did he tell police he ran for his car to get his gun, and why did he turn around 37.5 feet out |

9

| Claim presented to OCCA | Habeas claim |
|---|---|
| Ian Napier refused to leave.  Ian Napier told the Tulsa Police that he could hear a drawer inside the home open.  The TCDA did not correct this perjured testimony by Ian Napier nor did counsel. This affected the trial as well.  This is a <u>Napue</u> violation because it is clear that Ian Napier could hear the appellant, but he was told to leave and he was trespassing.   Ian Napier refused these commands of the home owner." Dkt. # 30-2 at 228-229. | in the yard to tell petitioner he'd be by his car. If he couldn't hear petitioner at his door, how is the petitioner going to hear him 37.5 feet away.   The TCDA knew Napier lied & is supported by evidence." <u>Id.</u> |

The OCCA affirmed the state district court's denial of Barnett's first application for post-conviction relief.  Dkt. # 30-2, at 473-479.  The OCCA explained that:

> [t]he Post-Conviction Procedure Act is not a substitute for direct appeal, nor is it intended as a means of providing a petitioner with a second direct appeal.  <u>Johnson v. State</u>, 1991 OK CR 124, ¶ 4, 823 P.2d 370, 372.  The Act provides petitioners with very limited grounds upon which to base a collateral attack on their judgments. <u>Logan v. State</u>, 2013 OK CR 2, ¶ 3, 293 P.3d 969, 973.  "Issues that were previously raised and ruled upon by this Court are procedurally barred from further review under the doctrine of <u>res judicata</u>; and issues that were not raised previously on direct appeal, but which could have been raised, are waived for further review." Logan, 2013 OK CR 2, ¶ 3, 293 P.3d at 973.

<u>Id.</u> at 475.  Concerning the claims outlined above, the OCCA concluded that Barnett had "not established sufficient reason for not asserting his current grounds for relief in previous proceedings." <u>Id.</u> at 475-476.  Therefore, the OCCA held these claims "are waived." <u>Id.</u> at 476.

## II.    Third application for post-conviction relief

Related to his instant petition, Barnett raised the following claim in his third application for post-conviction relief:

| Claim presented to state district court | Habeas claim |
|---|---|
| **Brady violation:** "State[']s intentional suppression of evidence in violation of <u>Giglio</u> and <u>Brady</u>." Dkt. # 30-4, at 215. "The State however did not turn over the compl[ai]nt from Susan Barrett showing that she said my husband was writing the comments on Facebook and hiding behind me. The State of Oklahoma suppressed this evidence in violation of <u>Giglio</u> and <u>Brady</u>." <u>Id.</u> at 216. | **Ground One:** "<u>Brady</u> and <u>Giglio</u> Violations, withholding and suppressing material exculpatory evidence." Dkt. # 7, at 5. "The State withheld reports from The University of Tulsa in which TU accused someone else of posting on my FB page, but the state had TU ready to testify that I had made all of these posts." <u>Id.</u> |

The district court concluded this claim was barred by Oklahoma Post-Conviction Procedure Act's one year statute of limitations, OKLA. STAT. tit. 22, § 1080.1. Dkt. # 30-4, at 281-282.

Within his appeal of the denial of this third application for post-conviction relief, Barnett presented the following claim:

| Claim presented to OCCA | Habeas claim |
|---|---|
| **Fourth Amendment Violation:** "The State conducted a warrantless search of my USB drive with no warrant and used the information against me at trial. This was also revealed on 12-20-23 and discovered for the first time through no fault of my own." Dkt. # 30-4, at 307. | **Ground Three:** "Fourth Amendment Violations, Thumb Drive and Cell Phones searched with no warrant." Dkt. # 7, at 8. "The state revealed on 12/20/2023 that they searched and copie[d] my phones, 4.5 years ago. The State also viewed the thumb drive that was on me when I was arrested with no warrant. The thumb drive was used at trial to convict me. My counsel did not move to suppress. In CF20193495, Judge David Guten found that both the cell phones and thumb drives were searched with no warrant and suppressed the information from CF20193495. The State sent the cell phones to Sapulpa to be searched to conceal the search." <u>Id.</u> |

The OCCA affirmed the district court's dismissal of his third application for post-conviction relief finding that relief was time barred pursuant to OKLA. STAT. tit. 22, § 1080.1. Dkt. # 30-4, at 320-322.

### III.    Barnett's claims are procedurally defaulted

The Court agrees that Barnett's claims were defaulted in state court. None of the claims presented in Barnett's instant petition were presented to the OCCA on direct appeal. Compare Dkt. # 7 with Dkt. # 30-1, at 8-42. Instead, most of Barnett's claims were presented to the OCCA for the first time when he appealed the denial of his first application for post-conviction relief. See Dkt. # 30-2, at 206-209, 217-232. A portion of Ground Three was presented for the first time in Barnett's appeal of the denial of his third application for post-conviction relief. See Dkt. # 30-4, at 305-310. Accordingly, the Court must determine if Barnett's claims were defaulted on an independent and adequate state procedural ground. McCracken, 268 F.3d at 976.

When the OCCA adjudicated Barnett's challenge to the denial of his first application for post-conviction relief, the OCCA rejected Barnett's claims under Oklahoma's Uniform Post-Conviction Procedure Act, OKLA. STAT. tit. 22, §§ 1080-89, which precludes defendants from raising in an application for post-conviction relief any claim that could have been raised on direct appeal or a prior application for post-conviction relief. Dkt. # 30-2, at 473-479. Liberally construing Barnett's petition, Barnett challenges the adequacy of Oklahoma's procedure. Dkt. # 7, at 6 ("The OCCA overlooked the main issues. They did not even address the Brady violations."); see also Dkt. # 29, at 5 ("I raised this issue for post conviction relief and the county court ignored it, the state refused to address it, the OCAA ignored it."). Nevertheless, courts routinely find Oklahoma's waiver rule is both independent and adequate. See, e.g., Smith v. Workman, 550 F.3d 1258, 1274 (10th Cir. 2008) ("The waiver of claims not brought on direct appeal is based on state

law, see 22 OKLA. STAT. tit. 22 § 1086, and this court has found Oklahoma's bar of claims not raised on direct appeal to be independent and adequate with respect to claims other than ineffective assistance of counsel[.]").

Concerning Barnett's Ground One claim regarding the University of Tulsa report (Dkt. # 7, at 5), Barnett did not present this claim in his petition in error appealing the denial of his third application for post-conviction relief. See Dkt. # 30-4, at 305-310. Accordingly, this claim was not fairly presented to the state court. Fairchild v. Workman, 579 F.3d 1134, 1151 (10th Cir. 2009). Further, the OCCA would apply an independent and adequate procedural bar if Barnett were to return to state court to exhaust this claim through an application for post-conviction relief because he could have, but did not, raise this claim in his direct appeal or initial application for post-conviction relief. Smallwood v. Gibson, 191 F.3d 1257, 1267 (10th Cir. 1999); Grant v. Royal, 886 F.3d 874, 891-92 (10th Cir. 2018). Therefore, this claim is also procedurally barred.

Finally, the OCCA declined to consider the merits of Barnett's claim that his thumb drive was searched without a warrant because that claim was time-barred. Dkt. # 30-4, at 320-321. The procedural bar applied, OKLA. STAT. tit. 22, § 1080.1, is also independent and adequate. See Mars v. Harpe, Case No. CIV-23-606-JD, 2025 WL 2715265, at *4 (W.D. Okla. Aug. 19, 2025) (unpublished),[8] reported and recommendation adopted by 2025 WL 2714553 (W.D. Okla. Sep. 23, 2025) (unpublished). Accordingly, all of Barnett's current claims were defaulted on independent and adequate state procedural grounds.

---

[8]    The Court cites all unpublished decisions herein as persuasive authority. FED. R. APP. P. 32.1(a); 10th Cir. R. 32.1(A).

## IV. Exceptions to the procedural bars

To have his claims heard on the merits by this Court, Barnett must find a way around the procedural bars.  Barnett's reply focuses on demonstrating prejudice and/or a miscarriage of justice.  See, e.g., Dkt. # 45, at 11 ("[T]he state claims I cannot show prejudice but I think I addressed this in previous pages of this answer very well."), 12 ("I think I have more than demonstrated a miscarriage of justice.").  The Court understands Barnett as conceding his claims are procedurally barred but he believes that he is entitled to an exception.  See id.; see also McCracken, 268 F.3d at 976.  Therefore, the Court will address each exception.

### A. Cause and prejudice

To establish the cause prong of the cause and prejudice exception, a petitioner must "show that some objective factor external to the defense impeded ... efforts to comply with the state procedural rules." Murray v. Carrier, 477 U.S. 478, 488 (1986).  Examples of such external factors include the discovery of new evidence, a change in the law, and interference by state officials. Id.

### i.  Cause

First, Barnett cannot establish sufficient cause as it relates to his Ground Two claim:  that the state committed a Napue violation in connection with his Facebook posts.  Dkt. # 7, at 7.  Barnett alleges that, "the state told the jury that I was planning to shoot and kill a process server and I had been planning for this my whole entire life."  Dkt. # 7, at 7.  At trial, two Facebook posts were admitted into evidence.  Dkt. # 32 (State's Exs. 20 and 21).  On February 7, 2019, Barnett posted that "the best process server is a dead one."  Dkt. # 32 (State's Ex. 20); see also Dkt. # 31-9, at 42.  On March 22, 2019, Barnett posted a Google search which asked, "Can I kill a process server for trespassing?"  Subsequently, Barnett posted, "Looks like the answer is yes.  I fear for my life.  They have a gun."  Dkt. # 32 (State's Ex. 21); see also Dkt. # 31-9, at 42-43.  The state

did not examine any witness regarding the contents of the Facebook posts; instead the posts were admitted pursuant to a stipulation.  See Dkt. # 31-9, at 42-43.  During closing, the state argued, "[h]e has been planning for this moment his whole life."  Dkt. # 31-10, at 25; see also id. at 48 ("He has been planning on it.  That is why he Googled those things.").

Barnett's position is that the prosecution's closing argument constitutes a Napue violation because the state allegedly possessed an undated letter from Susan Barrett, a professor at the University of Tulsa, complaining about a Facebook post on Barnett's Facebook and attributing the post to Barnett's husband.  Dkt. # 7, at 7.  Therefore, Barnett reasons that the prosecution's argument that Barnett was planning to shoot a process server was false.  See id.  However, the purported constitutional violation Barnett points to occurred at trial.  Barnett was present at trial and specifically testified he authored the Facebook posts.  Dkt. # 31-9, at 104-105.  Therefore, accepting Barnett's current assertion that the prosecutor's statements were false, he was aware of this fact at trial, at the latest, and failed to present this claim on direct appeal.  Therefore, Barnett cannot "show that some objective factor external to the defense impeded . . . efforts to comply with the state procedural rules."  Murray, 477 U.S. at 488.  Barnett has not shown cause as to Ground Two.

Second, Barnett cannot establish cause as it relates to part of his Ground Three claim:  that the warrantless search of his thumb drive violated the Fourth Amendment.  Dkt. # 7, at 8.  The thumb drive was provided to Barnett on January 30, 2020.  Dkt. # 31-13, at 153.  Further, the home security footage obtained from the thumb drive was presented to the jury by the state.  See Dkt. # 31 (State's Exs. 1 and 2).  Therefore, as it relates to this sub-claim, Barnett was aware the state had possession of the thumb drive and was utilizing its contents during his March 2020 trial, at the

15

latest. Therefore, Barnett cannot establish sufficient cause excusing his failure to raise this sub-claim earlier.

Concerning the rest of Barnett's claims,[9] Barnett's petition offers various dates when he learned of the basis of each claim. For example, concerning his <u>Brady</u> claim (Ground One), he alleges that "[he] raised everything" on direct appeal. Dkt. # 7, at 6.[10] Barnett alleges that he learned of the Fourth Amendment violation (Ground Three) on December 20, 2023. <u>Id.</u> at 8. Regarding his claim that a <u>Napue</u> violation occurred because Napier provided false testimony (Ground Four), Barnett alleges that he "just found out about it." <u>Id.</u> at 10. Regardless of the exact date Barnett gained the underlying knowledge of each of these constitutional violations, the dates Barnett provides all occurred after his December 17, 2020 direct appeal. <u>See</u> Dkt. # 30-1, at 8-42 and 120-126. Liberally construing Barnett's petition, the Court will assume without deciding that Barnett has established cause to overcome the procedural bar with respect to Ground One, the remainder of Ground Three, and Ground Four.[11]

### ii.    Prejudice

Nevertheless, Barnett still must establish resulting prejudice as to each claim to gain habeas review. <u>McCracken</u>, 268 F.3d at 976. As for prejudice, Barnett must show "'actual prejudice'

---

[9]    Ground One, remainder of Ground Three, and Ground Four.

[10]    In other filings, Barnett alleged that he learned of <u>Brady</u> material in November of 2022. <u>See</u> Dkt. # 30-2 at 218 (August 31, 2023 amended petition in error).

[11]    The Court acknowledges that respondent contends Barnett cannot rely on ineffective assistance of appellate counsel to establish cause to overcome the applicable procedural bars. <u>See</u> Dkt. # 30, at 44-45. However, even affording Barnett the benefit of liberal construction, Barnett's filings do not raise ineffective assistance of appellate counsel as cause excusing his procedurally defaulted claims. <u>See</u> Dkt. # 7, at 6-10; <u>see also</u> Dkt. ## 16, 28 and 29. Therefore, the Court does not analyze whether ineffective assistance of appellate counsel provides "cause" to excuse Barnett's procedural default.

resulting from the errors of which he complains." United States v. Frady, 456 U.S. 152, 168 (1982). The Court will address each claim below.

### a. Ground One:  Napier's mental health

Regarding the mental health treatment note, the Court disagrees that had this evidence been presented to the trial, the outcome would have changed.  The jury was presented the video footage from Barnett's home security system wherein jurors observed Napier knocking on the door, taking a step back, waving to someone on the other side of the door, gesturing to his ear that he could not hear, walking towards his car with the paperwork in his right hand, turning around briefly and pointing over his shoulder with his left hand before he was shot.  Dkt. # 32 (State's Exs. 1 and 2). Further, the jury listened to audio from Napier's cell phone wherein Napier said the following to Barnett:

> "Hi, I'm looking for Christopher."

> "Say again."

> "Okay, I'm just here trying to deliver documents to Christopher, that's all I'm trying to do."

> "Okay, I'm leaving but no unnecessary threats or acts of violence, it's all been recorded, okay."

> "I can't hear you unless you open the door.  I can't hear you.  I can't hear you."

> "I'll wait for you out here, okay?"

Dkt. # 32 (State's Exhs. 1, 2 and 3).  At no time did Napier threaten Barnett or raise his voice.  See id.  Contrary to Barnett's allegations, the jury's awareness of Napier's obsessive compulsive disorder and alleged propensity for outbursts would not have changed the outcome of Barnett's trial given that the jury was able to observe Napier's conduct and hear his tone.  Therefore, Barnett cannot establish prejudice from the lack of access to this evidence during trial.

### b.  Ground One:  cell phones

Barnett alleges that, unbeknownst to him until years later, the state conducted a warrantless search of his cell phone and suppressed the exculpatory information gleaned from the search.  See Dkt. # 7, at 5, 8; see also Dkt. # 29.  For example, Barnett's position is that his cell phone contained a recording he made of the of the incident and captured Barnett telling Napier "he was trespassing and to leave, he refused."  Dkt. # 29, at 3.  Barnett also alleges that his cell phone had text messages that "would have gone to proving [he] was in fear for [his] life, that [he] did not know Napier, who he was or that he was a process server."  Id. at 4.  Barnett also references an affidavit from his former attorney, Brendan McHugh, wherein Barnett allegedly texted McHugh the night of the incident "something to the effect of 'call me I have a 911, I just shot someone, the cops are on the way, he was trying to break in.'"  Dkt. # 16, at 17.  Barnett alleges that had the jury been informed of this information from his cell phone, the jury would have accepted Barnett's "stand your ground" defense.  Dkt. # 29, at 2.

The Court sets aside, for the moment, the credibility of Barnett's assertion that an exculpatory recording was on his cell phone, yet he failed to notify his counsel or attempt in any way to present this evidence to the jury.[12]  Accepting Barnett's premise, neither the recording nor McHugh's testimony would have changed the jury's verdict.  The jury was presented with evidence like what Barnett claims was on his cell phones.

The jury heard Barnett's eighteen-minute interview he conducted with a news outlet the day after the event.  Dkt. # 32 (State's Ex. 19).  In the interview, Barnett presented his version of

---

[12]    Barnett testified that he told his husband, "bring me a phone, please.  I did not have a phone in my hand."  Dkt. # 31-9, at 111.  George Barnett, Barnett's husband, also testified, after the gunshot, he grabbed Barnett's cellphone so that they could call the police.  Dkt. # 31-8 at 228.

events wherein he claimed Napier knocked on his door, pushed on his door, demanded Barnett open the door and attempted to break into Barnett's house.  Id.  Barnett also stated, during his interview, that he told Napier he was trespassing, he needed to leave, and if he did not, Barnett would shoot him.  Id.  Barnett also recounted during his interview that he observed Napier's gun in his backside as Napier walked away, Barnett opened the door, Napier turned around and grabbed his gun.  Id.  And that is when Barnett shot Napier because Napier was "reaching for [his gun], he was about to shoot me with it."  Id.

The jury also heard Barnett's testimony that he told Napier "he was at the wrong house and he was trespassing on private property."  Dkt. # 31-9, at 107.  Barnett allegedly observed that when Napier turned back around in Barnett's front yard, "it look[ed] like he [was] pulling a gun from his right-hand side."  Id. at 109.  Finally, the jury heard Barnett's 911 call.  Dkt. # 32 (Defense Ex. 1).  In addition to this evidence, the jury was instructed regarding self-defense.  Dkt. # 31-13, at 193-195.

Therefore, the jury weighed Barnett's version of events and rejected his self-defense theory.  Cumulative evidence of Barnett's version would not have changed the outcome of his trial.  Accordingly, Barnett cannot demonstrate prejudice concerning this Brady sub-claim.

### c.  Ground One:  United States Marshals Service's report

Barnett alleges that the state, in violation of Brady, failed to provide a United States Marshals Service's report "showing [he] did not threaten TU."  Dkt. # 7, at 5.  Barnett's alleged threats to the University of Tulsa are wholly unrelated to his shooting of Napier.  See n. 4, supra.  Therefore, had this evidence been presented to the jury, it would not have changed the outcome of the trial.  Barnett cannot establish prejudice as it relates to this Brady sub-claim.

#### d.  Ground One:  University of Tulsa report

Barnett alleges that there is a University of Tulsa report that accuses someone else of posting on Barnett's Facebook page.  Dkt. # 7, at 5.  Barnett does not reveal the date of the report or any specific Facebook post that was allegedly authored by someone other than himself.  See id. Nevertheless, Barnett testified that the Facebook posts presented to the jury, wherein he pondered shooting a process server and satisfied himself that he had the right to do so, were authored by him.  See State's Exhibits 20 and 21; see also Dkt. # 31-9 at 104-105.  Therefore, knowledge of the purported University of Tulsa report would not have changed the outcome of Barnett's trial.

#### e.  Ground Three:  unlawful search of cell phone

Barnett cannot establish prejudice as it relates to the remaining portion of Ground Three. Evidence from his cell phone was not presented to the jury.  Therefore, he was not injured by admission of evidence from the unlawful search of his cellphone.  To the extent he claims that the evidence on his cell phone was exculpatory and suppressed to his detriment, the Court addressed this contention supra with respect to Ground One, and the same analysis applies here.  The jury considered Barnett's version of events and rejected it.  Duplicative evidence of his version would not have changed the outcome of his trial.

#### f.  Ground Four:  Napier's false testimony

Finally, Barnett claims that the state committed another Napue violation because Napier "told the police several stories."  Dkt. # 7, at 10.  Allegedly, Napier told the police that "he ran for his car to get his gun" and then "turn[ed] around 37.5 feet out in the yard to tell petitioner he'd be by his car."  Id.  Barnett's position is that Napier's purportedly changing stories establish that Napier provided false testimony and that Barnett's "true" version of events supports his self-defense theory.  See id.  Fatally, Barnett cannot establish prejudice.

The evidence presented at trial established that Napier had his gun on him when he went to Barnett's door, not that it was in his car.  Dkt. # 31-8, at 197-198, 204; Dkt. # 31-9, at 7.  Napier's audio from his phone demonstrated that Napier stated multiple times he could not hear what Barnett was saying (Dkt. # 32 (State's Exs. 1, 2 and 3); Dkt. # 31-8, at 193), and Napier turned around to communicate to Barnett that he would wait near his car (Dkt. # 31-8, at 194).[13]  In other words, the contemporaneous evidence from the incident corroborates Napier's trial testimony and undermines Barnett's claim that a Napue violation occurred.  Even if the jury received Barnett's purported evidence that Napier allegedly "told the police several stories," the jury had objective video and audio evidence before it to evaluate the facts surrounding Barnett's shooting of Napier and any alleged inconsistencies in Napier's testimony.  Barnett thus cannot establish prejudice as it relates to Ground Four.

Therefore, as explained, Barnett failed to establish cause and prejudice as to each of his habeas claims.  The only remaining avenue for Barnett to have his claims reviewed on the merits by this Court is to demonstrate a miscarriage of justice.

## B.  Miscarriage of justice

Liberally construing Barnett's filings, the Court understands that Barnett believes he can avail himself of the miscarriage of justice exception.  See, e.g., Dkt. # 45 at 12.  As mentioned, Barnett provides a January 2024 affidavit from his former attorney, Brendan McHugh.  Dkt. # 16, at 17-20.  In his affidavit, McHugh states that, on the night of the incident, he received a text from Barnett which "said something to the effect of 'call me I have a 911, I just shot someone, the cops

---

[13]    As noted above, this was possibly in response to Barnett opening his front door.  See n. 3, supra.

are on the way, he was trying to break in.'" Id. at 17. McHugh opines that the text message supports Barnett's self-defense theory. Id. at 19.

The United States Court of Appeals for the Tenth Circuit ("Tenth Circuit") recognizes the "fundamental miscarriage of justice exception" is "commonly known as a showing of actual innocence[.]" Fontenot v. Crow, 4 F.4th 982, 1028 (10th Cir. 2021). "[P]risoners asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" House v. Bell, 547 U.S. 518, 536-37 (2006) (quoting Schlup v. Delo, 513 U.S. 298, 327 (1995)). Successful actual innocence claims are rare due to the demanding evidentiary requirements for such claims. McQuiggin v. Perkins, 569 U.S 383, 386, 401 (2013); House, 547 U.S. at 538. "To be credible, a claim of actual innocence requires a petitioner to present 'new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.'" Fontenot, 4 F.4th at 1031 (quoting Schlup, 513 U.S. at 324). Evaluating the merits of a gateway actual innocence claim requires a federal court to consider the trial record as supplemented by the new evidence and to make a "holistic judgment about all the evidence and its likely effect on reasonable jurors applying the reasonable-doubt standard." House, 547 U.S. at 539 (cleaned up). "Because a Schlup claim involves evidence the trial jury did not have before it, the inquiry requires the federal court to assess how reasonable jurors would react to the overall, newly supplemented record." Id. at 538.

The Tenth Circuit has not foreclosed the possibility that evidence in support of an affirmative defense can establish actual innocence. See Pacheco v. Habti, 62 F.4th 1233, 1241 n.8 (10th Cir. 2023). It has, however, recognized the difference between (1) an actual innocence claim that "only reduce[s] the degree of guilt," and (2) an actual innocence claim based on "new evidence

22

clearly establishing self-defense that negated guilt," which may be a viable actual innocence argument. Id. Accordingly, the Court accepts that Barnett's position and affidavit may present a viable actual innocence argument, and the Court will proceed to the merits of Barnett's actual innocence claim.

Assuming without deciding that the affidavit[14] is new and reliable evidence, the Court concludes a reasonable jury would not change its verdict. First, the jury was informed of the self-defense theory Barnett championed shortly after the incident. See Dkt. # 32 (Defense Ex. 1 and State's Ex. 19. Therefore, McHugh's affidavit is cumulative, at best.

Second, Barnett testified that Napier did not try to push his way into Barnett's residence and that Napier did not pull a gun on him. On cross-examination the following exchange occurred:

Q:  Well, that is what you told the news reporter from Channel 23, right, that he was pushing on your door. He was trying to push his way into your house, correct?

A:  That is correct.

Q:  And that was an embellishment, correct?

A:  Correct.

***

Q:  He did not pull a gun on you, did he?

A:  He did not, that is correct.

---

[14]   Barnett also suggests there is an exculpatory audio recording on his phone from the incident. Dkt. # 29, at 2. However, Barnett does not present an affidavit or any other evidence to support his position. His self-serving allegations alone are insufficient to support passing through the actual innocence gateway. Fontenot, 4 F.4th at 1031. Further, the Court finds Barnett's position implausible considering both he and his husband testified he did not have his phone on his person during the event. Dkt. # 31-9, at 111; Dkt. # 31-8, at 228. Accordingly, the Court will not consider the merits of an actual innocence gateway claim as it relates to a purported audio recording on Barnett's phone.

**Q**:  He did not point a gun at you, did he?

**A**:  No, he didn't.

Dkt. No. 31-9, at 124-125.  Furthermore, the jury viewed the video footage and heard the audio recording from the incident.  Dkt. # 32 (State's Ex. 1, 2 and 3).  At no time did Napier threaten Barnett verbally, attempt to enter Barnett's home or display a weapon.  Id.  Therefore, the jury already weighed Barnett's self-defense theory with the contemporaneous evidence from the event in question.  The jury rejected Barnett's self-defense theory.  A cumulative text message wherein Barnett claimed Napier tried to break into his home would not have changed the outcome because the video evidence and Barnett's own testimony refute Barnett's statement in the text message to McHugh.  Therefore, inclusion of McHugh's testimony at trial would not have impacted a reasonable jury's verdict.  For these reasons, the fundamental miscarriage of justice exception is inapplicable and cannot be used to access habeas review of Barnett's Grounds One, Two, Three or Four.

**CONCLUSION**

The Court finds and concludes Barnett cannot obtain federal habeas relief under 28 U.S.C. § 2254.  Barnett's claims presented in his petition are procedurally defaulted, and Barnett has not demonstrated cause and prejudice sufficient to allow this Court to consider his claims.  Nor can Barnett avail himself of the fundamental miscarriage of justice exception.  Accordingly, the Court denies Grounds One through Four as procedurally barred.  The Court further concludes no certificate of appealability shall issue because reasonable jurists would not debate the correctness of this Court's determinations that Barnett's claims are procedurally barred and that he did not make the showings necessary to overcome the procedural bars.  28 U.S.C. § 2253(c); Slack v. McDaniel, 529 U.S. 473, 484 (2000).

**IT IS THEREFORE ORDERED** that the petition (Dkt. # 7) is **denied**; a certificate of appealability is **denied**; and a separate judgment shall be entered in this matter.

**IT IS FURTHER ORDERED** that the Clerk of Court shall note on the record the substitution of Tommy Sharp, Warden, in place of Casey Hamilton as party respondent.

**IT IS FURTHER ORDERED** that Barnett's motion to update respondent (Dkt. # 75) is **granted**.

**DATED** this 1st day of July, 2026.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE